UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SAXON GLASS TECHNOLOGIES, INC.,

               Plaintiff,

      v.

APPLE INC.,

               Defendant.

_____

**DECISION AND ORDER**

1:15-CV-00581 EAW

UNITED STATES DISTRICT COURT
FILED
JUN 20 2019
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

## INTRODUCTION

Plaintiff Saxon Glass Technologies, Inc. ("Plaintiff" or "Saxon") commenced the instant action on June 29, 2015, asserting federal and state claims of trademark infringement, dilution, and unfair competition against defendant Apple Inc. ("Defendant" or "Apple"). (Dkt. 1). Currently pending before the Court are Defendant's motion for summary judgment (Dkt. 77), Defendant's motions in limine seeking to exclude expert testimony by James T. Berger, Rhonda Harper, and Scott D. Woldow (Dkt. 87; Dkt. 88; Dkt. 89), and Plaintiff's motion in limine seeking to exclude expert testimony by Jeffrey Samuels (Dkt. 76). For the reasons discussed below, Defendant's motion in limine related to James T. Berger is granted in part and denied in part, Defendant's motion in limine related to Rhonda Harper is denied, Defendant's motion in limine related to Scott D. Woldow is granted in part and denied in part, Plaintiff's motion in limine is denied as moot, and Defendant's motion for summary judgment is granted.

# FACTUAL BACKGROUND

The following facts are taken from Defendant's Statement of Undisputed Facts (Dkt. 79) and Plaintiff's response thereto (Dkt. 96-1), as well as the exhibits and declarations submitted by the parties. Unless otherwise noted, these facts are undisputed.

Ion exchange is "a general scientific term that describes the exchange of one type of ion (such as a sodium ion in glass) with another (such as a potassium ion in salt)." (Dkt. 79 at ¶ 5; Dkt. 96-1 at ¶ 5). In 2002, Plaintiff obtained federal trademark registration number 2,639,419 for its IONEX® mark which it uses in connection with "chemical treatment of glass; namely, chemical strengthening of glass by immersion in a molten salt bath." (Dkt. 79 at ¶ 2; Dkt. 96-1 at ¶ 2). Plaintiff offers chemical glass strengthening services using an ion exchange process under its IONEX® mark. (Dkt. 79 at ¶ 1; Dkt. 96-1 at ¶ 1). Plaintiff does not claim exclusive rights to the term "ion exchange." (Dkt. 79 at ¶ 6; Dkt. 96-1 at ¶ 6).

Plaintiff offers its glass strengthening services to businesses, not to general consumers. (Dkt. 79 at ¶ 8; Dkt. 96-1 at ¶ 9). Defendant asserts that Plaintiff has a single customer, Gerresheimer Glass Inc. ("Gerresheimer"), which makes glass cartridges that are used in auto-injectors such as an EpiPen. (Dkt. 79 at ¶¶ 9-10). In opposition, Plaintiff contends that it has also made sales under the IONEX® mark to Samsung and Nippon Electric Glass. (Dkt. 96-1 at ¶ 9). At a deposition held on May 18, 2016, Dr. Arun Varshneya ("Dr. Varshneya"), Plaintiff's president and chief executive officer, testified that the only company for which Plaintiff had "used the IONEX mark for products that have actually been released" was Gerresheimer and that Plaintiff had a "relationship" with

Nippon Electric Glass. (Dkt. 89-3 at 7)[1]. Plaintiff has also submitted evidence that in July 2015, it chemically strengthened 70 units of glass for Samsung. (Dkt. 96-8). The glass cartridges to which Plaintiff applies its ion exchange strengthening process do not bear the IONEX® mark or any other branding related to Plaintiff. (Dkt. 79 at ¶¶ 12-15; Dkt. 96-1 at ¶¶ 12-15).

On September 9, 2014, Defendant announced the launch of a line of products under the brand Apple Watch. (Dkt. 79 at ¶ 17; Dkt. 96-1 at ¶ 17). Defendant began selling Apple Watch products in April 2015. (Dkt. 79 at ¶ 18; Dkt. 96-1 at ¶ 18). Certain versions of the Apple Watch device include a sapphire crystal cover glass, while other versions include a glass cover that has been strengthened using an ion exchange process. (Dkt. 79 at ¶¶ 19, 23; Dkt. 96-1 at ¶¶ 19, 23). Defendant contends that it "describes the versions of the Apple Watch device that include a cover glass that has been strengthened through an ion exchange process with the shorthand term 'Ion-X Glass,'" (Dkt. 79 at ¶ 24), while Plaintiff maintains that Defendant "does not 'describe' using the word ION-X" (Dkt. 96-1 at ¶ 24). It is undisputed that Defendant "uses the term 'Ion-X Glass' on the back face of certain versions of the Apple Watch device, along with descriptions of other components such as '7000 Series Aluminum' and 'Composite Back.'" (Dkt. 79 at ¶ 26; Dkt. 96-1 at ¶ 26).

Defendant has not applied to register "Ion-X" with the United States Patent & Trademark Office (the "USPTO"), nor does it include "Ion-X" on the list of trademarks it

---

[1]     Page references are to those generated by the Court's CM/ECF system.

maintains on its website. (Dkt. 79 at ¶¶ 32-33; Dkt. 96-1 at ¶¶ 32-33). Defendant's linguistics expert, Dr. Patrick Farrell,[2] conducted an analysis of the meaning and usage of the term "Ion-X." (Dkt. 79 at ¶ 30; Dkt. 96-1 at ¶ 30). Dr. Farrell concluded that the term "Ion-X," as used by Defendant, is likely to be understood as a descriptive abbreviation for ion exchange. (Dkt. 79 at ¶ 31; Dkt. 96-1 at ¶ 31). James T. Berger, a marketing expert retained by Plaintiff whose opinions are discussed at length later in this Decision and Order, stated at his deposition that Defendant "uses 'Ion-X' 'as a description of a component part' of the Apple Watch Device." (Dkt. 79 at ¶ 34; Dkt. 96-1 at ¶ 34). Defendant's marketing expert, Dr. Ravi Dhar,[3] has submitted a sworn declaration in support of Defendant's motion for summary judgment stating that, in his expert opinion, consumers are unlikely to think of "Ion-X glass" as an indicator of source. (Dkt. 86 at ¶ 7).

Plaintiff's IONEX® mark does not appear on products or advertising that a general consumer would see. (Dkt. 79 at ¶ 38; Dkt. 96-1 at ¶ 38). Plaintiff does not use media advertisements of its services and products and the sole advertisement Plaintiff has run was in the general interest newspaper *The Alfred Sun* in December 2016, after the instant litigation commenced. (Dkt. 79 at ¶¶ 43-45; Dkt. 96-1 at ¶¶ 43-45). Plaintiff's total

---

[2]    Dr. Farrell has a Ph.D. in linguistics from the University of California, San Diego, and is a professor of general and theoretical linguistics at the University of California, Davis. (Dkt. 85 at ¶ 2). Plaintiff has not challenged the admissibility of Dr. Farrell's expert opinions.

[3]    Dr. Dhar has a Ph.D. in business administration from the University of California at Berkeley and is the George Rogers Clark Professor of Management and Marketing at the Yale School of Management, and the Director of the Yale Center for Customer Insights at the School of Management at Yale University. (Dkt. 86 at ¶¶ 2-3). Plaintiff has not challenged the admissibility of Dr. Dhar's expert opinions.

marketing costs in 2014 and 2015 (the only years for which it provided such information) were $108,000. (Dkt. 79 at ¶ 49; Dkt. 96-1 at ¶ 49). Dr. Varshneya testified at his deposition that he had no reason to believe that the typical American household would be familiar with Plaintiff's IONEX® mark. (Dkt. 79 at ¶ 42; Dkt. 96-1 at ¶ 42). The IONEX® mark has not been the subject of any media coverage, nor has Plaintiff produced any studies that show consumers associate the IONEX® mark with Plaintiff. (Dkt. 79 at ¶¶ 51-52; Dkt. 96-1 at ¶¶ 51-52). Plaintiff's IONEX® mark does not appear on any actual products but is used on packing crates and invoices and on Plaintiff's website. (Dkt. 79 at ¶¶ 63-66; Dkt. 96-1 at ¶¶ 63-66).

Apple Watch devices are identified as Apple-branded products. (Dkt. 79 at ¶ 68; Dkt. 96-1 at ¶ 68). Defendant has produced documents showing that Apple Watch devices and associated advertising depict the term "Ion-X" in close proximity to Apple's word mark or logo. (Dkt. 80-19; Dkt. 81-3; Dkt. 81-5; Dkt. 81-6; Dkt. 81-16; Dkt. 81-29; Dkt. 82).[4] Defendant requested a trademark search before it began using the term "Ion-X" commercially. (Dkt. 79 at ¶ 73; Dkt. 96-1 at ¶ 73).

Plaintiff and Defendant have not received any communications intended for the other, and the only instances of "actual confusion" that Plaintiff has identified after Defendant began using the phrase "Ion-X" are not Saxon customers, but a friend of Dr.

_____

[4]     Plaintiff states in its opposition to Defendant's Statement of Undisputed Facts that "[t]he proximity and circumstances about ION-X placement are not defined." (Dkt. 96-1 at ¶ 69). It is not clear to the Court what this statement means. "Close proximity" is a generally understood phrase in the English language, and a review of the documents submitted by Defendant shows that where it uses the phrase "Ion-X glass," the Apple word mark or logo appears nearby.

Varshneya's and Dr. Varshneya's landlord. (Dkt. 79 at ¶¶ 81-82, 84; Dkt. 96-1 at ¶¶ 81-82, 84). Plaintiff relies on two likelihood of confusion surveys in connection with this litigation, the details of which are discussed further in the Court's analysis of Defendant's motions in limine.

Plaintiff's target customers are professional buyers of glass chemical strengthening services. (Dkt. 79 at ¶ 92; Dkt. 96-1 at ¶ 92). Plaintiff does not have an internet store or a product catalog. (Dkt. 79 at ¶ 93; Dkt. 96-1 at ¶ 93). Defendant sells the Apple Watch device to individual general consumers. (Dkt. 79 at ¶ 98; Dkt. 96-1 at ¶ 98). An Apple Watch device costs at least $249. (Dkt. 79 at ¶ 95; Dkt. 96-1 at ¶ 95). Additionally, an Apple Watch device works only as a companion to an Apple iPhone device, and so Apple Watch consumers must either be owners of an Apple iPhone device or purchase one at the same time as the Apple Watch device. (Dkt. 79 at ¶¶ 96-97; Dkt. 96-1 at ¶¶ 96-97).

## PROCEDURAL BACKGROUND

Plaintiff commenced the instant action on June 29, 2015 (Dkt. 1), alleging the following causes of action related to its IONEX®, ION-KLAD®, and unregistered ION-ARMOR marks: (1) federal trademark infringement and unfair competition; (2) federal trademark dilution; (3) state law trademark infringement; (4) state law trademark dilution; and (5) state law unfair competition. (Dkt. 1). Defendant filed its Answer to Plaintiff's Complaint on August 21, 2015 (Dkt. 9), and the matter was referred to United States Magistrate Judge Leslie G. Foschio for supervision of discovery (Dkt. 10). Judge Foschio recused himself from the matter on December 1, 2015 (Dkt. 16), and the matter was thereafter referred to United States Magistrate Judge H. Kenneth Schroeder, Jr. (Dkt. 18).

On January 13, 2016, Defendant moved pursuant to 28 U.S.C. § 1659(a) to stay the matter in its entirety pending a determination of the United States International Trade Commission (the "ITC") in *In the Matter of Certain Electronic Devices for Containing Strengthened Glass and Packaging Thereof*, Investigation No. 337-TA-981 (the "ITC Investigation"[5]). (Dkt. 21). Judge Schroeder granted Defendant's motion to stay on January 26, 2016. (Dkt. 22).

On September 13, 2016, Plaintiff filed an unopposed motion advising the Court that the ITC Investigation had terminated and asking the Court to lift the stay. (Dkt. 23). The Court granted Plaintiff's motion and the stay was lifted on September 13, 2016. (Dkt. 24).

On October 24, 2016, pursuant to a stipulation by the parties, the Court entered an Order dismissing Plaintiff's second cause of action for federal trademark dilution. (Dkt. 28).

Discovery in this matter was completed in July 2018 (Dkt. 49; Dkt. 54), and dispositive motions were due by September 28, 2018 (Dkt. 54). The Court granted a joint request by the parties that—due to the amount of confidential business material involved in this case—they be permitted to exchange motion papers without filing them on the Court's electronic docket, so that a single sealing request regarding all papers could be made at the conclusion of briefing. (Dkt. 57).

---

[5] The ITC Investigation was occasioned by Plaintiff having filed a complaint with the ITC on November 10, 2015, related to Defendant's use of the term "Ion-X." (Dkt. 21 at 2).

On September 28, 2018, Defendant served its motion for summary judgment (Dkt. 77) and three motions in limine (Dkt. 87; Dkt. 88; Dkt. 89), while Plaintiff served a single motion in limine (Dkt. 76).[6] Opposition papers were served on October 30, 2018 (Dkt. 90; Dkt. 96; Dkt. 97; Dkt. 98; Dkt. 99), and reply papers were served on November 20, 2018 (Dkt. 100; Dkt. 101; Dkt. 102; Dkt. 103; Dkt. 104).

On November 8, 2018, pursuant to a stipulation by the parties, the Court entered an Order dismissing Plaintiff's fourth cause of action (state law trademark dilution) in its entirety and dismissing Plaintiff's first, third, and fifth causes of action to the extent they related to Plaintiff's ION-KLAD® and ION-ARMOR marks. (Dkt. 69; Dkt. 70). Thus, the remaining causes of action at issue with the pending motions are the claims for federal and state trademark infringement and unfair competition related to Plaintiff's IONEX® mark.

Oral argument on the pending motions was held before the undersigned on April 19, 2019, and the Court reserved decision. (Dkt. 130).

---

[6]     Because of the sealing procedure previously described, all of the papers associated with the pending motions were filed on the Court's electronic docket on December 28, 2018. The Court has referred in its discussion to the date the documents were served by the parties.

## DISCUSSION

### I. MOTIONS IN LIMINE[7]

#### A. Legal Standard

Pursuant to Federal Rule of Evidence 702, a proposed expert witness must possess "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In accordance with this rule, a court considering the admissibility of expert testimony must consider whether (1) "the testimony is based upon sufficient facts or data"; (2) "the testimony is the product of reliable principles and methods"; and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (c), (d).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court explained that a trial court has a "gatekeeping" duty under Rule 702, and must make sure that proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) ("In *Daubert*, this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable.") (quotation and alteration omitted).

---

[7] "In deciding whether a motion for summary judgment should be granted, a district court may only consider admissible evidence." *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 25 (E.D.N.Y. 2009). Accordingly, "as the Second Circuit has explained, it is the proper role of the district court to consider the admissibility of expert testimony in determining whether summary judgment is warranted." *Id.*

"Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). "Ultimately, the party proffering the expert has the burden to demonstrate by a preponderance of the evidence that its expert witness satisfies these criteria." *Id.* (quotation and alteration omitted). "As the courts and Advisory Committee have made clear, 'the rejection of expert testimony is the exception rather than the rule.'" *M.B. ex rel. Scott v. CSX Transp., Inc.*, 130 F. Supp. 3d 654, 665 (N.D.N.Y. 2015) (quoting Fed. R. Evid. 702, Advisory Committee's Note).

## B.  Defendant's Motions in Limine

Defendant has filed three motions in limine, each of which is addressed to a different expert witness proffered by Plaintiff.  The Court considers each of these motions below.

### 1.  Motion in Limine Regarding James T. Berger

Defendant's first motion in limine seeks to exclude the opinions of Plaintiff's proposed expert James T. Berger in their entirety. (Dkt. 87).  For the reasons that follow, the Court grants the motion in part and denies the motion as moot in part.

#### a.  The Contested Opinions and Evidence

Mr. Berger is a faculty member at Roosevelt University, teaching courses in advertising, consumer behavior, personal selling and sales management, global marketing, marketing management, and marketing in theory and practice. (Dkt. 87-5 at 4).  Mr. Berger holds a master's degree in business administration from the University of Chicago

Graduate School of Business and has "extensive market research experience, including quantitative and qualitative survey research." (*Id.* at 5-6).

In connection with the instant matter, Plaintiff retained Mr. Berger to "develop and conduct a survey among professional buyers of strengthened glass to explore the likelihood of confusion between the Plaintiff's IONEX® mark and the Defendant's ION-X mark." (*Id.* at 9). Mr. Berger conducted a survey that he describes as "not a standard likelihood of confusion survey," but instead a "qualitative analysis of a highly specialized target market." (*Id.* at 14). In particular, Mr. Berger surveyed 40 "individuals who make buying decisions with respect to strengthened and/or other forms of commercial glass" over the telephone. (*Id.* at 11). The participants were instructed to "write on a piece of paper the letters . . . I-O-N-E-X" and then further instructed to "write I-O-N-DASH X." (*Id.* at 12). The participants were told to consider IONEX "BRAND X" and to consider ION-X "BRAND Y," and were asked the following six questions: (1) "Do you believe that Brand X and Brand Y are likely to produce confusion in the marketplace for chemically strengthened glass and/or glass treatment services?"; (2) "Do Brand X and Brand Y appear to be the same to you?"; (3) "Do Brand X and Brand Y sound the same to you?"; (4) "Do Brand X and Brand Y give you the impression that the products sold under these brands come from the same commercial source?"; (5) "Do Brand X and Brand Y give you the impression that the products are affiliated with each other?"; and (6) "Do Brand X and Brand Y give you the impression that one product is sponsored by the other?" (*Id.* at 12-13). Based on the results of this survey, Mr. Berger opines that Ion-X is "confusingly similar" to IONEX®. (*Id.* at 14).

Mr. Berger also submitted two rebuttal expert reports, one related to Dr. Dhar's expert report and one related to an expert report prepared by Dr. Deborah Jay. (Dkt. 87-21; Dkt. 87-22).

### b. Admissibility of the Berger Survey and Related Opinions

Defendant argues that Mr. Berger's survey (the "Berger Survey") and his related opinions are inadmissible under Rule 702. Specifically, Defendant argues that (1) the methodology of the Berger Survey is so flawed as to render it inadmissible; (2) Mr. Berger's opinions on dilution by tarnishment are speculation and are unreliable; and (3) Mr. Berger's rebuttal reports are conclusory, misstate applicable law, and would be misleading and confusing to a jury. (Dkt. 87-1 at 7-8).

Defendant's arguments regarding Mr. Berger's opinions on dilution by tarnishment have been rendered moot by the dismissal of all of Plaintiff's dilution claims. (*See* Dkt. 28; Dkt. 69; Dkt. 70). Moreover, the Court finds that it need not reach Defendant's arguments regarding Mr. Berger's rebuttal reports because, even taking those opinions into account, the Court finds summary judgment in Defendant's favor appropriate, for the reasons discussed in Section II of this Decision and Order. The Court has considered Defendant's remaining arguments and concludes that the Berger Survey and all related opinions by Mr. Berger are inadmissible.

"Survey evidence is generally admissible in cases alleging trademark infringement under the Lanham Act." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 580 (S.D.N.Y. 2007). In considering the admissibility of particular survey evidence, the Court must consider numerous factors, including whether:

- 12 -

(1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts.

*Id.* (citation omitted). As one court in this Circuit has explained:

When evaluating survey evidence, errors in a survey's methodology usually go to the weight accorded to its conclusions rather than its admissibility. However, the Second Circuit has made clear that this general rule is subject, of course, to [Federal] Rule [of Evidence] 403's more general prohibition against evidence that is less probative than prejudicial or confusing. Although it is the exception, there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and its probative value is substantially outweighed by its prejudicial effect.

*POM Wonderful LLC v. Organic Juice USA, Inc.*, 769 F. Supp. 2d 188, 197 (S.D.N.Y. 2011) (citations, quotations, and original alterations omitted). "The bottom line is that if the survey suffers from substantial methodological flaws, it will be excluded under both Rule 403 and Rule 702." *Louis Vuitton*, 525 F. Supp. 2d at 581; *see also Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (finding a survey "so badly flawed that it [could not] be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion"); *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 739 (S.D.N.Y. 2011) ("[W]hile errors in survey methodology usually go to weight of the evidence, a survey should be excluded under Rule 702 when it is invalid or unreliable, and/or under Rule 403 when it is likely to be insufficiently probative, unfairly prejudicial, misleading, confusing, or a waste of time.").

Defendant argues that the Berger Survey should be excluded because it is a "one-off" survey that does not follow any accepted survey methodology. (Dkt. 87-1 at 10).

Defendant argues in particular that the Berger Survey failed to replicate marketplace conditions, asked leading questions, did not survey the relevant universe, failed to use an appropriate sample size, and failed to use a control. (*Id.* at 10-11). Defendant notes that at least five other courts have excluded surveys developed by Mr. Berger due to similar methodological flaws. (*Id.* at 10 n.1 (collecting cases)).

In opposition, Plaintiff argues that the Berger Survey is "qualitative" and not "quantitative," and that Defendant's arguments are therefore misplaced. (Dkt. 98 at 6-7, 9-10). Plaintiff further argues that Defendant has ignored the internet marketplace and that Mr. Berger's methodology was appropriate when considered in this context. (*Id.* at 10-14).

The Court rejects Plaintiff's argument that the labeling of the Berger Survey as "qualitative" excuses the methodological flaws identified by Defendant. The methodology criteria applied by courts in this context are meant to ensure that a survey's ultimate conclusions are reliable and therefore helpful to the trier of fact. *See POM Wonderful*, 769 F. Supp. 2d at 197. Regardless of whether Mr. Berger considers his survey qualitative or quantitative, the Court must perform its gatekeeping functions under Rules 403 and 702 to ensure that the proffered evidence is potentially helpful to the trier of fact. Indeed, federal courts have consistently applied methodological requirements to focus group studies, which is what Mr. Berger analogized his so-called "qualitative" survey to at his deposition. (Dkt. 87-4 at 24-25); *see, e.g., Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 277 (4th Cir. 2002) (finding focus group evidence not admissible as to consumer confusion because of methodological flaws); *Merisant Co. v. McNeil Nutritionals, LLC*, 242 F.R.D. 315, 331

(E.D. Pa. 2007) (finding focus group materials unreliable and not probative in part because of lack of information regarding methodologies); *Sam's Wines & Liquors, Inc. v. Wal-Mart Stores, Inc.*, No. 92 C 5170, 1994 WL 529331, at *7 (N.D. Ill. Sept. 27, 1994) (considering methodological challenges to focus group results and finding that more information was required to establish whether evidence was unduly prejudicial). The reasoning behind these decisions is clear: a survey that fails to apply an appropriate methodology is essentially nothing more than a collection of hearsay, with no indicia of reliability.

Plaintiff has identified no cases holding that a "qualitative survey" need not be performed in a methodologically sound manner. When asked if such a case existed at oral argument, Plaintiff's counsel referred to *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017). However, the *LVL XIII Brands* case does not support Plaintiff's position. While the court did explain that qualitative expert testimony is not *per se* excludable, it went on to exclude the proffered testimony precisely because the expert "failed entirely to show a sufficiently rigorous analytical connection between his qualitative methodology and his conclusions." *Id.* at 646-47 (quotation and alterations omitted). In other words, the *LVL XIII Brands* decision confirms that even a "qualitative" survey must have some grounding in an appropriate methodology in order to be reliable and therefore helpful to the trier of fact.

The Court further agrees with Defendant that the flaws in the Berger Survey are so fundamental as to render it unreliable and inadmissible. First, the Court notes that Plaintiff has failed to offer any substantive rebuttal to Plaintiff's argument that the Berger Survey had an insufficient sample size and failed to use a control. These two flaws are sufficient

to render the Berger Survey more prejudicial than probative due to lack of reliability. Turning first to the lack of a control, a leading trademark treatise explains:

> In a trademark likelihood of confusion survey, a properly constructed survey has at least two groups of respondents: one group (the "test cell") is shown the allegedly infringing mark; the second group (the "control cell") is shown a mark similar in appearance to the test cell, except for the designation whose influence is being tested.

6 McCarthy on Trademarks and Unfair Competition § 32:187. "A survey designed to estimate likelihood of confusion must include a proper control. . . . Without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010) ("*THOIP I*"). "As courts routinely hold, a survey's lack of a control group or control questions constitutes . . . [a] ground for granting a Rule 702 motion to exclude." *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 463 (E.D. Va. 2017) (footnote omitted), *aff'd*, 707 F. App'x 138 (4th Cir. 2017); *see also Vista Food Exch., Inc. v. Vistar Corp.*, No. 03-CV-5203DRHWDW, 2005 WL 2371958, at *6 (E.D.N.Y. Sept. 27, 2005) (excluding survey performed by Mr. Berger in part because he failed to use an appropriate control). Here, there is no dispute that the Berger Survey did not use a control group or control questions, and Plaintiff has failed to offer any substantive explanation for this failure, save its unavailing argument that a so-called "qualitative" survey need not comport with appropriate methodologies.

Insufficient sample size is also a critical consideration in assessing the admissibility of a survey. *See Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, No. 02 Civ. 3691(DLC), 03 Civ. 707(DLC), 2004 WL 326708, at *9 (S.D.N.Y. Feb. 23, 2004) (finding

survey of 52 individuals not admissible to show confusion because "the number of respondents surveyed [was] too small to provide meaningful results"). Here, the Berger Survey had only 40 participants, which Mr. Berger admitted at his deposition was an insufficient number to produce a reliable survey. (Dkt. 87-4 at 24-25). Again, Plaintiff has failed to offer any substantive response to Defendant's argument on this point beyond its contentions about qualitative surveys in general. The small sample size of the Berger Survey makes its results statistically insignificant and of minimal probative value.

In addition to these two points, the Court further agrees with Plaintiff that the Berger Survey is unreliable and not probative because it used leading questions and failed to include a visual stimulus. "A survey is not credible if it relies on leading questions which are inherently suggestive and invite guessing by those who did not get any clear message at all." *Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 352 (S.D.N.Y. 2008) (quotation omitted); *see also Valador*, 242 F. Supp. 3d at 448 ("Suggestive questions render a survey unreliable by creating 'demand effects' or 'cues' from which a respondent can 'infer the purpose of the survey and identify the "correct" answers.'" (quoting 6 McCarthy on Trademarks § 32:172)).

Here, the Berger Survey asked questions such as "Do you believe that Brand X [IONEX] and Brand Y [ION-X] are likely to produce confusion in the marketplace for chemically strengthened glass and/or glass treatment services?" and "Do Brand X and Brand Y give you the impression that the products sold under these brands come from the same commercial source?" (Dkt. 87-5 at 12-13). These are the precise types of questions that courts have found improperly suggestive in evaluating the admissibility of survey

evidence. For example, in *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06 CIV 550(JFK), 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007), the court found survey questions leading where the respondents were shown the marks "cargo" and "kargo," and then "asked whether they believed a connection, as to source, business relationship, or sponsorship, existed between the companies whose marks the respondents had just seen." *Id.* at *8. The *Kargo* court explained that "[u]nder such circumstances, the respondents who later stated that they believed that there was a connection between *Cargo* and *Kargo* due to the similarity of the names, and thus were tallied as 'confused', were demonstrating merely that they had read the names 'cargo' and 'kargo' in artificially close proximity." *Id.* at *9.

In this case, the participants in the Berger Survey were exposed to IONEX and ION-X side-by-side and then immediately asked whether they believed there was a connection between the companies whose marks they had just seen. "[Q]uestion[s] about whether the two items are put out by the same or a related source is likely to generate so-called 'demand effects' that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items." *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1048 (S.D. Ind. 2000); *see also Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445, 450-51 (S.D.N.Y. 1982) (finding that the question "Do you think that there may or may not be a business connection between Beneficial Capital Corp. and the Beneficial Finance System Companies?" was of little probative value because it "establishes no more

than that the names are similar . . . , and that portions of the general public will make the reasonable assumption, that, in the absence of any other information, two companies with similar names are likely to have a business connection").

Plaintiff argues that the questions in the Berger Survey were not improperly leading because Mr. Berger was using a *"Squirt* type methodology" and not an *"Eveready* type survey." (Dkt. 98 at 13-14).[8] However, courts have disapproved of the use of leading questions in the context of the *Squirt* survey method. *See, e.g., People's United Bank v. Peoplesbank*, No. 3:08cv01858 (PCD), 2010 WL 2521069, at *7 (D. Conn. June 17, 2010) (finding that a *Squirt*-style survey used leading questions and provoked a demand effect), *aff'd*, 401 F. App'x 607 (2d Cir. 2010); *Simon*, 104 F. Supp. 2d at 1048 (finding as one reason to exclude a *Squirt*-style survey the fact that it used leading questions). Plaintiff has not cited any cases in which a court found it appropriate for a survey using the *Squirt* method to employ leading questions. Mr. Berger's use of improper leading questions is another reason that the Berger Survey is non-probative and inadmissible.

The Berger Survey is also non-probative because of Mr. Berger's failure to use a standardized visual stimulus. As one court in this Circuit has explained:

> Typically, trademark infringement surveys use stimuli, such as pictures, advertisements or clothing, that directly expose potential consumers to the products or the marks in question. To be probative of actual confusion, a

---

[8]     "There are two common methods for surveying the likelihood of confusion. . . . The first is the *Eveready* method; the second is the *Squirt* method. The *Eveready* survey, which is particularly apt where the plaintiff's senior mark is strong and widely-recognized, does not inform respondents what the senior mark is, but assumes that they are aware of the mark from their prior experience. The *Squirt* format, on the other hand, presents the respondent with both of the conflicting marks." *Valador*, 242 F. Supp. 3d at 464 (quotation and citations omitted).

survey must use stimuli that approximate what a potential customer would encounter in making purchasing decisions. A survey that uses stimuli that differ from what a consumer is actually likely to see in the marketplace does not accurately test for actual consumer confusion and thus lacks probative value.

*Kargo*, 2007 WL 2258688, at *10 (citations and quotations omitted). "[A] survey must use the proper stimulus, one that tests for confusion by replicating marketplace conditions." *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999)

However, in this case, Mr. Berger did not use a standardized visual stimulus. Instead, participants in the Berger Survey were instructed to "write on a piece of paper the letters . . . I-O-N-E-X" and then further instructed to "write I-O-N-DASH X[.]" (Dkt. 87-5 at 12). Mr. Berger acknowledged at his deposition that this did not constitute a standardized stimulus. (Dkt. 87-4 at 18-19). Where a survey uses an "improper or unrepresentative stimul[us]" it is of "severely diminished probative value." *Kargo*, 2007 WL 2258688, at *11; *see also Louis Vuitton*, 525 F. Supp. 2d at 568 (excluding survey because of the "cumulative effect of a number of flaws," including "the use of an improper stimulus").

These numerous flaws are sufficiently fundamental that they render the Berger Survey unreliable and more prejudicial than probative. The Court therefore finds that the Berger Survey is inadmissible under Rules 403 and 702. Accordingly, the Court need not reach Defendant's contention that the Berger Study failed to use an appropriate universe, which would require the Court to reach factual issues regarding whether the respondents to the Berger Survey were indeed prospective buyers of Plaintiff's services.

## 2.    Motion in Limine Regarding Rhonda Harper

Defendant's second motion in limine addresses the admissibility of a consumer confusion survey performed by Plaintiff's expert witness Rhonda Harper, as well as Ms. Harper's associated expert opinions. The Court finds Ms. Harper's survey admissible and denies Plaintiff's motion, for the reasons discussed below.

### a.    The Contested Opinions and Evidence

Ms. Harper is owner of the research, consulting, and testimony firm Rhonda Harper LLC and has 30 years of corporate marketing and research experience, having conducted or caused to be conducted more than 1,000 quantitative surveys. (Dkt. 88-3 at 4-5). Ms. Harper conducted two surveys in connection with this litigation, but subsequently withdrew one of these surveys. (Dkt. 88-1 at 6 n.1). The remaining survey, referred to herein as the "Harper Survey," was an online survey wherein the sample was drawn from "males and females ages 18+ with incomes $50k+ who are past or potential purchasers of a smart-watch." (Dkt. 88-3 at 9). Respondents were split into a control group (326 individuals) and a test group (346 individuals), and the test group was shown the marks IONEX and ION-X, while the control group was shown the marks SAMSUNG and APPLE. (*Id*. at 10). The respondents were then presented with a single multiple-choice question in which they were told to imagine that they were shopping for a smart-watch and saw the names on the back of the watch and on the packaging, and then asked about their beliefs regarding the source of the products. (*Id*.). Thirty-two percent of respondents stated that they believed IONEX and ION-X were either put out by the same company or by two companies that are affiliated or associated with each other. (*Id*. at 11).

### b.    <u>Admissibility of the Harper Survey and Related Opinions</u>

Defendant argues that the Harper Survey is not admissible because it failed to replicate market conditions, created demand effects by asking one multiple-choice question, used an improper control, and failed to survey the appropriate universe. (Dkt. 88-1 at 6-8). The Court has reviewed these arguments and finds that while it does appear that the Harper Survey has methodological problems, the infirmities are not so severe as to render it inadmissible.

As the Court noted in its discussion of the Berger Survey, the general rule is that "[w]hen evaluating survey evidence, errors in a survey's methodology usually go to the weight accorded to its conclusions rather than its admissibility." *POM Wonderful*, 769 F. Supp. 2d at 197. Here, unlike Mr. Berger, Ms. Harper conducted a survey that was not a one-off, so-called "qualitative survey," but was instead intended to be a standard quantitative survey. Ms. Harper also used an appropriate sample size.

The Court acknowledges that Defendant has raised multiple valid criticisms of the Harper Survey. The Court agrees that the control used by Ms. Harper was likely not a proper control. "To fulfill its function, a control should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." *THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 181 (S.D.N.Y. 2011) ("*THOIP II*") (quotation and alteration omitted). Here, the controls used by Ms. Harper (SAMSUNG and APPLE) are well-known marks and have no resemblance to IONEX and ION-X, the items being tested. Moreover, Ms. Harper admitted at her deposition that "nothing" about the control marks was similar to the test marks and that

these controls were chosen in a deliberate effort to keep the baseline level of confusion low. (*See* Dkt. 88-4 at 35, 37-38).

Ms. Harper also failed to use a visual stimulus, but instead asked the survey participants to "imagine" that they were shopping for a smartwatch and saw either IONEX or ION-X on the packaging and the back of the watch. (Dkt. 88-3 at 10). Courts have disapproved of the use of these kinds of "conceptual stimuli," explaining that "[w]hat [the] survey takers saw in their minds is unknown and unknowable." *J.T. Colby & Co., Inc. v. Apple Inc.*, No. 11 Civ. 4060(DLC), 2013 WL 1903883, at *21 (S.D.N.Y. May 8, 2013), *aff'd*, 586 F. App'x 8 (2d Cir. 2014).

The single multiple-choice question used by Ms. Harper is also somewhat leading, and it appears that the universe may have been overly broad, inasmuch as Ms. Harper did not limit the survey to individuals who indicated a present interest in purchasing a smartwatch in the price range of the Apple Watch device. *See Louis Vuitton,* 525 F. Supp. 2d at 630 (finding survey participants improperly screened where they were asked only if they were "likely to purchase 'within the next year or so' a purse or handbag costing more than $100," and handbags at issue were more expensive).

The Court does not discount the significance of the methodological flaws discussed above and agrees with Defendant that they render the Harper Survey of limited evidentiary value. However, "there is 'no such thing as a "perfect" survey. The nature of the beast is that it is a sample, albeit a scientifically constructed one.'" *THOIP I*, 690 F. Supp. 2d at 230 (quoting 6 McCarthy on Trademarks § 32:184). Accordingly, the general rule is that cross-examination, and not exclusion by the Court, is "the appropriate way to raise

criticisms of the survey's methods." *On Site Energy Co. v. MTU Onsite Energy Corp.*, No. 10-CV-1671 (JS)(WDW), 2012 WL 2952424, at *3 (E.D.N.Y. July 19, 2012). Unlike the Berger Survey, which failed to even attempt to apply an appropriate methodology, the Harper Survey used an appropriate sample size, separated participants into a control group and a test group, and at least somewhat comported with standard survey design. Accordingly, the Harper Survey is not, on its face, so fatally flawed as to be excluded under Rules 403 and 702. The Court therefore denies Defendant's motion to exclude the Harper Survey.

### 3. Motion in Limine Regarding Scott D. Woldow

Defendant's third and final motion in limine seeks to exclude the opinions offered by Plaintiff's proffered expert witness Scott D. Woldow. For the reasons set forth below, the Court grants the motion in part and denies the motion in part.

#### a. The Contested Opinions and Evidence

Mr. Woldow holds a juris doctorate from The American University Washington College of Law and a master's of business administration from The American University Kogod College of Business Administration, and is a practicing trademark attorney with the law firm Smith, Gambrell & Russell, LLP in Washington, D.C. (Dkt. 89-6 at 5). From 1998 to 1999, Mr. Woldow was a Trademark Examining Attorney at the USPTO. (*Id.*).

Mr. Woldow authored an expert report dated March 15, 2018, in which he offered the following opinions: (1) the IONEX® mark is not a descriptive term and is a distinct source identifier that any reasonable trademark practitioner would identify as potentially confusingly similar with the "ION-X mark"; (2) a reasonable trademark attorney would

not recommend adoption and use of the "ION-X mark" based on the prior use and registration of the IONEX® mark; and (3) Defendant's fair use defense is contrary to Defendant's actions. (*Id.* at 9). These opinions are discussed with more particularity in the Court's consideration of their admissibility.

### b. **Admissibility of Mr. Woldow's Opinions**

Defendant asks the Court to exclude Mr. Woldow's opinions in their entirety for the following reasons: (1) Mr. Woldow offers improper legal opinions on the ultimate issues to be decided in this case; (2) Mr. Woldow applied the incorrect methodology to determine likelihood of confusion; (3) Mr. Woldow is not qualified to offer opinions about consumer psychology, marketing, or linguistics; (4) Mr. Woldow cannot opine about Apple's intent; and (5) Mr. Woldow's opinions are based on insufficient facts or data. (Dkt. 89-1 at 6-8). The Court has considered each of these arguments and finds that portions of Mr. Woldow's testimony are not admissible, for the reasons discussed below.

First, the Court agrees with Defendant that Mr. Woldow's expert report is replete with opinions related not to trademark law (the area in which Mr. Woldow is proffered as an expert) but to consumer psychology, marketing, or linguistics. For example, Mr. Woldow's expert report contains the following opinions, among others:

- "ION-X is likely to be perceived as a trademark by consumers. The ordinary consumer is likely to view Ion-X as a trademark by visual appearance alone." (Dkt. 89-6 at 13)

- "The consuming public is likely to recognize the use of ION-X on the Apple Watch Sport as a feature of the product because it looks like a trademark as applied to the watch and as applied to the packaging for the goods." (*Id.*).

- "Apple's use of ION-X in connection with the Apple Watch Sport is likely to be noticed and considered by consumers because it is set off from the surrounding words." (*Id.*).

- "[B]ased on appearance alone, an ordinary consumer or a specialized buyer of glass is likely to view Apple's examples as trademark usage, not descriptive usage." (*Id.*).

- "Buyers of chemically strengthened glass will likely be aware that not all glass can be strengthened by the ion-exchange chemical treatment process." (*Id.*).

- "An ordinary consumer is not likely to consider [Defendant's use of the phrase 'Ion-X glass'] to be descriptive usage. . . . The ordinary purchaser . . . isn't likely to consider Ion-X as a descriptive abbreviation of the ion-exchange glass strengthening process. They are more likely to view it as a trademark for a product feature not a scientific abbreviation describing how smaller ions are replaced be larger ions to create a stronger surface layer." (*Id.* at 14).

- "The ordinary consumer is likely not aware of 'ion exchange technology' or any alleged abbreviation for it." (*Id.* at 18).

- "[I]t seems more plausible that the average consumer has no idea what ion exchange glass strengthening is or that it has any such alleged abbreviation." (*Id.* at 19).

- "A reasonable consumer of both sport watches and chemically strengthened glass would likely find the marks ION-X and IONEX® as highly similar in appearance, sound, connotation and commercial impression." (*Id.* at 21).

Mr. Woldow also purports to "concur with [the] results" of Ms. Harper's survey. (*Id.* at 22).

"It is well established that even if a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *LVL XIII Brands*, 209 F. Supp. 3d at 638 (quotation omitted). For example, in *LVL XIII Brands*, the plaintiff sought to have its expert witness, an attorney and professor of law, opine on whether a particular trademark had achieved secondary meaning. *Id.* at 637-40. The Court found his testimony

inadmissible, explaining that although the proffered expert's "experience and education may qualify him as an expert in certain areas of fashion history and intellectual property law," it did not qualify him to opine on the empirical question of whether a trademark had achieved secondary meaning. *Id.* at 638.

Similarly, in this case, while Mr. Woldow is qualified to be an expert in the area of trademark law, he admitted at his deposition that he has no expert qualifications in consumer psychology, marketing, or linguistics. (*See* Dkt. 89-5 at 15-17). A trademark lawyer has no particularized knowledge regarding the understanding and perceptions of an ordinary consumer, nor of the understanding and perceptions of a specialized buyer of glass. Here, Mr. Woldow essentially speculates as to what an ordinary consumer or a specialized buyer of glass would know or think, which is confirmed by the language he uses in his expert report. (*See, e.g.,* Dkt. 89-6 at 19 ("[I]t seems more plausible that the average consumer has no idea what ion exchange glass strengthening is or that it has any such alleged abbreviation.")). The Court sees no basis for permitting Mr. Woldow to present a jury with this speculation, which is outside his field of training. *See LVL XII Brands*, 209 F. Supp. 3d at 639-40 (holding that "expertise most germane" to an empirical determination of consumer association involves "training or experience performing empirical analyses," and declining to permit attorney to opine thereon because his opinions would be mere conjecture); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 282 (S.D.N.Y. 2010) (finding experts in jewelry history and appraisal unqualified to testify as to whether particular trade dress was identifiable to consumers and distinctive, because neither expert had training in how the public perceived products). The fact that Mr. Woldow's legal

practice intersects with and involves issues of consumer confusion does not render him an expert on the topic, any more than a medical malpractice attorney is an expert on human physiology or a real estate attorney is an expert on construction. To hold otherwise would allow attorneys to qualify as experts in areas far outside the legal field, simply because they have concentrated their practice in a particular subject matter.

Mr. Woldow also may not simply opine that he concurs with Ms. Harper's survey findings. "A[n] [expert], however well credentialed he may be, is not permitted to be the mouthpiece of a[n] [expert] in a different specialty." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002); *see also In re M/V MSC Flaminia*, No. 12-cv-8892 (KBF), 2017 WL 3208598, at *22 (S.D.N.Y. July 28, 2017) ("[A] proffered expert may not simply pass off as their own, or serve as a vehicle for presenting, the opinions of others in subjects on which the proffered expert is not personally qualified."). Here, Mr. Woldow has no expertise in conducting consumer surveys, and he may not simply repeat Ms. Harper's findings and state that he concurs with them.

The Court further agrees with Defendant that Mr. Woldow has offered improper and speculative opinions regarding Defendant's motivations. In particular, in opining as to Defendant's fair use defense, Mr. Woldow speculates that at some point in time, Defendant "switched its view of the ION-X mark as a trademark and began to consider it as an allegedly descriptive term." (Dkt. 89-6 at 24). "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004). Accordingly, Mr. Woldow may not opine that Defendant at one point viewed Ion-X as a trademark. However, Mr. Woldow

may opine as to whether Defendant's actions are those that would be recommended by a reasonable trademark attorney.

To the extent Defendant argues that Mr. Woldow has offered improper legal opinions, in light of the Court's resolution of Defendant's motion for summary judgment, this contention is denied as moot. The Court has not relied on or been confused by Mr. Woldow's view of the law in assessing the parties' contentions.

For the foregoing reasons, Defendant's motion in limine to exclude Mr. Woldow's expert opinions (Dkt. 89) is granted to the extent that Mr. Woldow opines as to the perception and understanding of either an ordinary consumer or a specialized buyer of glass, to the extent Mr. Woldow speculates as to Defendant's motivations, and to the extent that Mr. Woldow opines that he concurs with Ms. Harper's survey results, and is otherwise denied.

C.     **Plaintiff's Motion in Limine**

Plaintiff moves pursuant to *Daubert* to exclude certain testimony by Defendant's expert witness Jeffrey Samuels. (Dkt. 76). Mr. Samuels is an attorney and former Assistant Commissioner for Trademarks at the USPTO, as well as a retired professor of intellectual property, who offered a rebuttal to Mr. Woldow's report. (Dkt. 76-1 at 5).

Plaintiff asks the Court to preclude Mr. Samuels from testifying as to "matters outside the scope of a rebuttal report and on ultimate issues of fact that the jury will be asked to decide." (Dkt. 76 at 4). In particular, Plaintiff asks the Court to prohibit Mr.

Samuels from offering opinions "regarding how to assess the *Polaroid*[9] factors in making a determination on likelihood of confusion." (*Id.* at 7). Plaintiff contends that these opinions by Mr. Samuels are unhelpful to the trier of fact and will merely waste time and unnecessarily confuse the jury. (*Id.* at 7-9).

In light of its resolution of Defendant's motion for summary judgment, which has been decided without reference to any expert opinions offered by Mr. Samuels, the Court finds that Plaintiff's motion in limine need not be resolved. Accordingly, the Court denies Plaintiff's motion in limine as moot.

## II.  MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the

---

[9]    *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961).

party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## B.     Fair Use

Defendant seeks summary judgment on the basis that its use of the phrase "Ion-X glass" constitutes fair use. (Dkt. 78 at 8). "The fair use doctrine permits use of a protected mark by others to describe certain aspects of the user's own goods." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 64 (2d Cir. 2000). The Second Circuit has explained:

> It is a fundamental principle marking an outer boundary of the trademark monopoly that, although trademark rights may be acquired in a word or image with descriptive qualities, the acquisition of such rights will not

prevent others from using the word or image in good faith in its descriptive sense, and not as a trademark.

*Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269 (2d Cir. 1995); *see also* 15 U.S.C. § 1115(b)(4) (it is a defense to a claim of trademark infringement that "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin"). "In order to assert a successful fair use defense to a trademark infringement claim, the defendant must prove three elements: that the use was made (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013). Fair use is an affirmative defense on which Defendant bears the burden of proof, *see id.*, and applies to both common-law trademark claims and claims under the Lanham Act, *Car-Freshner*, 70 F.3d at 268-69.

### 1. Applicability of Fair Use Defense

Before reaching the merits of Defendant's fair use defense, the Court first addresses Plaintiff's threshold contention that Defendant's fair use defense is "illusory" because § 1115(b)(4) only applies to "an ordinary word, or a phrase made up of ordinary words." (Dkt. 96 at 8). In other words, Plaintiff argues that because the challenged phrase in this case is "Ion-X glass" and not "ion exchange glass," fair use does not apply as a matter of law. Plaintiff further argues that a fair use defense is not available to Defendant as a matter

of law because IONEX® is not a descriptive trademark. (Dkt. 96 at 10-12). The Court rejects these contentions by Plaintiff, for the reasons that follow.

"It will be useful at the outset to restate some basic principles of trademark law, which, although they should be familiar, tend to become lost in a welter of adjectives." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). In particular, it is relevant to the instant discussion that there are generally "four different categories of terms with respect to trademark protection. Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Id.* "A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species," and is not eligible for trademark protection. *Id.* A descriptive term may be a valid trademark only if it has acquired a secondary meaning and become distinctive of the applicant's goods in commerce. *Id.* at 10. A suggestive term is one that "requires imagination, thought and perception to reach a conclusion as to the nature of goods," and is "entitled to registration without proof of secondary meaning," as are terms that are "fanciful or arbitrary." *Id.* at 10-11 (quotation omitted).

Plaintiff argues that the case law does not support the conclusion that "infringing uses of arbitrary or fanciful marks may be subject to a fair use defense" or that a fair use defense may be invoked "when the infringing use involves a coined word or phrase with a non-standard derivation such as ION-X." (Dkt. 96 at 8-10). Plaintiff relies on the Southern District of New York's decision in *Cullman Ventures, Inc. v. Columbian Art Works Inc.*,

717 F. Supp. 96 (S.D.N.Y. 1989) for the proposition that the use of a hyphen in the term

Ion-X means it is not an "ordinary word term" and therefore cannot qualify as a fair use.

(Dkt. 96 at 9). However, the *Cullman Ventures* decision was premised on that court's

holding that "[t]he 'fair use' defense is available only in actions involving descriptive

trademarks." 717 F. Supp. at 133. The Second Circuit expressly disavowed the *Cullman*

*Ventures* holding six years later in the *Car-Freshner* case, stating:

> Regardless whether the protected mark is descriptive, suggestive, arbitrary,
> or fanciful as used in connection with the product or service covered by the
> mark, the public's right to use descriptive words or images in good faith in
> their ordinary descriptive sense must prevail over the exclusivity claims of
> the trademark owner.

70 F.3d at 269.

Plaintiff attempts to write off this statement by the Second Circuit as mere "dicta"

(Dkt. 96 at 9 n.2), but no court has interpreted it as such, nor could one reasonably do so,

given the *Car-Freshner* court's extensive discussion of the issue and its relevance to the

ultimate holding in that case. *See, e.g., Radio Channel Networks, Inc. v. Broadcast.Com,*

*Inc.*, No. 98 CIV. 4799 (RPP), 1999 WL 124455, at *3 (S.D.N.Y. Mar. 8, 1999), *aff'd*, 201

F.3d 432 (2d Cir. 1999) ("The Second Circuit has made clear that it is not necessary that

the plaintiff's mark be classified as 'descriptive' within the four-fold hierarchy of

trademark types (generic, descriptive, suggestive, and arbitrary or fanciful). *See Car-*

*Freshner*, 70 F.3d at 269–70. Instead, what matters is whether the defendant has used the

mark (1) in good faith, and (2) in its descriptive sense."). Moreover, in this Circuit, the fair

use defense has been considered in the context of fanciful marks since at least the 1970s.

*See Venetianaire Corp. of Am. v. A & P Imp. Co.*, 429 F.2d 1079, 1082 (2d Cir. 1970)

- 34 -

(considering whether the defendant had engaged in a fair use of the word "hygienic" or had infringed on the plaintiff's mark "Hygient," which the court noted was "arbitrary and fanciful").

Other federal courts have also not limited the fair use defense to so-called ordinary words. *See, e.g., Bell v. Harley Davidson Motor Co.*, 539 F. Supp. 2d 1249, 1260 (S.D. Cal. 2008) ("The fair use defense is not limited to terms that one can find in a dictionary."). For example, in *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460 (9th Cir. 1993), the plaintiff had a registered trademark, VCR-2®, for its videocassette recorder machine. *Id.* at 1462. "Competitors [of the plaintiff], which [made] receivers and other machines to which two videocassette recorders may be attached, [had] labeled the terminals on the backs of their machines 'VCR-1' and 'VCR-2,' with and without the hyphen," and the plaintiff claimed trademark infringement. *Id.* The Ninth Circuit found as a matter of law that the defendants' use of the term "VCR-2" was fair use. *Id.* at 1466.

Similarly, in *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055 (7th Cir. 1995), the Seventh Circuit held that a juice company's use of the phrase "sweet-tart," which was not found in the dictionary, was nonetheless fair use and did not infringe on the plaintiff's trademark, SweeTARTS®. *Id.* at 1058-59; *see also SportFuel, Inc. v. PepsiCo, Inc.*, No. 16 C 7868, 2018 WL 2984830, at *5 (N.D. Ill. June 14, 2018) (rejecting argument that fair use defense did not apply because "SportFuel" is not a dictionary-defined term), *appeal dismissed*, No. 18-2524, 2018 WL 6986653 (7th Cir. July 30, 2018).

The Court agrees with these courts that there is no reason to limit a fair use defense to words found in a dictionary and rejects Plaintiff's threshold argument that the fair use

defense does not apply to the claims at issue in this litigation. The Court therefore considers on the merits whether the elements of a fair use defense have been established as a matter of law.

### 2. Non-Trademark Use

The Second Circuit has "equated use as a mark with the use of a term as a symbol to attract public attention." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 400 (2d Cir. 2009) (quotations and alterations omitted); *see also Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 424 (S.D.N.Y. 2008), *aff'd*, 329 F. App'x 333 (2d Cir. 2009) ("A trademark use occurs when a mark indicates the source or origin of consumer products."). So, for example, where a contested phrase is "located on the package in a place and manner that only the close reader would notice," the use is less likely to constitute use as a mark. *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 361 (2d Cir. 1983). "[N]on-trademark use of the challenged phrase" may also be "evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks." *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997).

Based on the record before the Court in this case, a reasonable jury would necessarily find that Defendant is not using Ion-X as a trademark. Defendant has produced extensive evidence supporting this conclusion. In particular, Defendant has demonstrated that every time it uses the phrase "Ion-X glass," it does so in close proximity to either the Apple word mark or the Apple logo, and that it does so on the back of the Apple Watch device and in other places where the Apple Watch device's features are being described.

Defendant has also submitted Dr. Dhar's expert opinion that consumers are unlikely to perceive "Ion-X glass" as a source identifier. (*See* Dkt. 86-1 at 78). Mr. Berger's rebuttal report, which the Court has reviewed, does not contain any persuasive substantive criticism of this opinion by Dr. Dhar. (*See* Dkt. 87-21). Moreover, Defendant has not applied for a trademark on "Ion-X" and does not claim any exclusive rights to the use of that phrase.

In opposition to Defendant's summary judgment motion, the sole evidence Plaintiff points to in support of its argument that Defendant is using Ion-X as a trademark is Mr. Woldow's expert report, wherein he opines, among other things, that "[t]he ordinary consumer is likely to view Ion-X as a trademark through visual appearance alone." (Dkt. 96 at 11-12). However, as the Court has discussed at length above, Mr. Woldow is a trademark attorney and has no expertise in what an ordinary consumer is likely to perceive or understand. Accordingly, as the Court has already found, these opinions by Mr. Woldow are not admissible and cannot serve as competent evidence in support of Plaintiff's contentions. Therefore, Defendant has established its satisfaction of the first element of a fair use defense, and Plaintiff has failed to come forward with any competent, admissible evidence from which a reasonable jury could conclude that Defendant is using Ion-X as a trademark.

### 3. Use in a Descriptive Sense

The second requirement for a successful fair use defense is that the use be made "in a descriptive sense[.]" *Kelly-Brown*, 717 F.3d at 308. "Whether a use is descriptive must be determined by assessing the manner in which the mark is used with respect to the product or service sold by the alleged infringer." *EMI Catalogue P'ship*, 228 F.3d at 65.

Moreover, "[w]here a mark incorporates a term that is the only reasonably available means of describing a characteristic of another's goods, the other's use of that term in a descriptive sense is usually protected by the fair use doctrine." *Id.*

The Second Circuit's decision in *Car-Freshner* provides insight into what it means to use a term in a descriptive sense. There, the court found that the use of a pine-tree shape for an air freshener was descriptive because "the pine-tree shape describes two aspects of [the defendant's] product. The pine tree refers to the pine scent of its air freshening agent. Furthermore, as a Christmas tree is traditionally a pine tree, the use of the pine-tree shape refers to the Christmas season, during which [the defendant] sells this item." 70 F.3d at 270. *Car-Freshner* thus teaches that descriptive use is not narrowly defined and is satisfied where there is a relationship between the challenged use and particular aspects of the goods in question.

In this case, Plaintiff chose to adopt a mark that incorporates most of the term "ion exchange," a well-known (within the relevant industry) scientific term for a chemical process for strengthening glass. It therefore accepted the risk that other businesses would use similar terminology to truthfully describe their own products. *See Cosmetically Sealed Indus.*, 125 F.3d at 30 ("If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase."). Defendant uses the abbreviated term "Ion-X" to convey the fact that its glass watch covers have been chemically strengthened using an ion exchange process. Plaintiff concedes that its own expert, Mr. Berger, testified at deposition that Defendant uses Ion-X as "a

description of a component part" of certain Apple Watch devices. (Dkt. 79 at ¶ 34; Dkt. 96-1 at ¶ 34).[10]

At oral argument, Plaintiff's counsel suggested that the Court should conclude that Defendant does not use Ion-X in a descriptive sense because (1) the USPTO concluded that IONEX® was not descriptive, and that analysis applies with equal force to a consideration of whether Defendant is using Ion-X descriptively, (2) the general public is not aware of the existence of the ion exchange process, and (3) certain employees of Defendant referred in emails to "naming" components of the Apple Watch device. The Court does not find these arguments persuasive.

First, as Defendant's counsel noted at oral argument, the record before the Court indicates that Plaintiff did not inform the USPTO at the time it registered the IONEX® mark that it was used in connection with an ion exchange process. (*See* Dkt. 80-18 at 2). Under these circumstances, the Court is not convinced that the USPTO's determination is instructive with respect to the descriptiveness of Ion-X.

Second, Plaintiff's argument regarding the general public's knowledge of the ion exchange process misses the point. There is no dispute that if Defendant had used the phrase "ion exchange glass," that would have been considered descriptive, regardless of the general public's understanding of the scientific underpinnings. Nothing in the fair use

---

[10]    Plaintiff's counsel suggested at oral argument that Mr. Berger had "misspoken" when he testified in this regard. However, Plaintiff has not submitted a declaration from Mr. Berger stating that this is the case or any other admissible evidence contradicting Mr. Berger's sworn deposition statements.

case law suggests that a use cannot be descriptive simple because it refers to a relatively obscure or specialized aspect of the goods in question.

Third, while a small number of Defendant's employees may have referred to "Ion-X" as a "name" for one of the Apple Watch device's components, this does not establish non-descriptive use. A name can be descriptive—indeed, there is an inherent desirability in choosing a name that describes the product's attributes, which is why trademark law requires that secondary meaning be established before such a name can become a registered trademark. Plaintiff has produced nothing from which a jury could find that this reference to "naming" by certain of Defendant's employees somehow means that the use of the phrase "Ion-X glass" is not descriptive. Accordingly, based on the record before the Court, Defendant has established the second element of a fair use defense.

### 4. Good Faith

The third and final element of a fair use defense is that the use has been undertaken in good faith. "In analyzing the proper scope of fair use good faith, . . . the focus of the inquiry is . . .whether defendant in adopting its mark intended to capitalize on plaintiff's good will." *EMI Catalogue P'ship*, 228 F.3d at 66. Defendant has borne the burden of demonstrating conclusively that its actions were taken in good faith. Good faith may be "evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks." *Cosmetically Sealed Indus.*, 125 F.3d at 30. Here, there is no question that Defendant has prominently displayed its own trademarks in connection with the Apple Watch device, and there is nothing in the record

to suggest that Defendant was somehow trying to capitalize on good will associated with Plaintiff.

Plaintiff has failed to produce or point to any admissible evidence to contradict Defendant's showing of good faith. Instead, Plaintiff argues that bad faith is shown because Defendant had prior knowledge of Plaintiff's IONEX® registration. (Dkt. 96 at 12). However, the Second Circuit has rejected the argument that prior knowledge is sufficient to show bad faith. *Car-Freshner*, 70 F.3d at 270. Plaintiff also argues that Mr. Woldow's expert opinions are evidence of Defendant's bad faith, but the portion of Mr. Woldow's expert report cited by Plaintiff is based on his unsupported opinion that there is a "likelihood of confusion between the IONEX® and ION-X marks." (*See* Dkt. 96 at 12). The Court has already explained that Mr. Woldow has no expertise in consumer perceptions or understandings and that he is unqualified to opine as to the likelihood of confusion. Accordingly, his dependent opinion as to what actions a reasonable trademark attorney would take where there was a likelihood of confusion is not probative of the issue of good faith. On the record before the Court, no reasonable jury could find that Defendant acted in bad faith in its use of the phrase "Ion-X glass."

For all the foregoing reasons, the Court finds that Defendant has demonstrated its entitlement to summary judgment. On the instant record, a reasonable trier of fact would necessarily conclude that Defendant's use of the phrase "Ion-X glass" constituted fair use and was not unlawful trademark infringement or unfair competition.

## C.    Likelihood of Confusion

In addition to seeking summary judgment based on its fair use affirmative defense, Defendant also contends that it is entitled to summary judgment because there is no likelihood of confusion, as is required to show trademark infringement. The Court agrees, for the reasons discussed below.

"A plaintiff's trademark is protected by federal law against infringement by use of colorable imitations of the mark which are likely to cause confusion, or to cause mistake, or to deceive." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016) (quotation omitted). Accordingly, "[a] claim of trademark infringement under the Lanham Act is analyzed under a two-prong test. The first prong looks to whether the senior user's mark is entitled to protection; the second to whether the junior user's use of its mark is likely to cause consumers confusion as to the origin or sponsorship of the junior user's goods." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016) (citations omitted). Likelihood of confusion is a "common element" of federal trademark infringement, federal unfair competition, common-law trademark infringement, and common-law unfair competition claims. *Pristine Indus., Inc. v. Hallmark Cards, Inc.*, 753 F. Supp. 140, 144 (S.D.N.Y. 1990).

"In determining whether there is a likelihood of consumer confusion for trademark infringement," courts in this Circuit "apply the eight-factor balancing test set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961)." *Int'l Info. Sys.*, 823 F.3d at 160. The eight *Polaroid* factors are:

the strength of the senior user's mark; the similarity of the parties' marks; the proximity of the parties' areas of commerce; the likelihood that the senior user will bridge the gap separating their areas of activity; the existence of actual consumer confusion; whether the junior user acted in bad faith or was otherwise reprehensible in adopting the mark; the quality of the junior user's product; and the sophistication of the relevant consumer group.

*Guthrie Healthcare*, 826 F.3d at 37. "Courts should not treat any one factor as dispositive, nor apply a mechanical process awarding judgment to the party with the greatest number of factors weighing in its favor." *Id.* (quotation omitted). Summary judgment is appropriate on a trademark infringement claim "if, considering the record as a whole, 'the undisputed evidence would lead to only one conclusion as to whether confusion is likely.'" *Knowles-Carter v. Feyonce, Inc.*, 347 F. Supp. 3d 217, 224 (S.D.N.Y. 2018) (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996)).

Defendant argues that, on the record before the Court, Plaintiff will be unable to satisfy its burden of showing a likelihood of confusion, whether forward or reverse. (Dkt. 78 at 16).[11] Plaintiff contends in opposition that the evidence in this case creates a material issue of fact as to the likelihood of confusion. (Dkt. 96 at 13).

The Court has considered the evidence before it, the parties' arguments, and each of the *Polaroid* factors and, for the reasons discussed below, finds that no reasonable jury could find a likelihood of confusion on the current record.

---

[11]    "Forward confusion is the traditional form of confusion in which the junior user uses the mark to sell goods or services based on the misperception that they originate with the senior user. Reverse confusion exists when a subsequent user selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user." *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 156 (S.D.N.Y. 2011) (citation and quotation omitted), *aff'd*, 508 F. App'x 31 (2d Cir. 2013).

## 1.     **Strength of Plaintiff's Mark**

The first *Polaroid* factor is the strength of Plaintiff's mark.  "The strength of a mark is its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source."  *Cadbury Beverages*, 73 F.3d at 479 (quotations omitted).  "In somewhat circular fashion, consideration of this factor includes an evaluation of the same characteristics that initially determined a mark's validity:  inherent distinctiveness, descriptiveness, and secondary meaning."  *Time, Inc. v. Petersen Pub. Co. LLC*, 173 F.3d 113, 117 (2d Cir. 1999).  "Along with the inherent distinctiveness of a mark, the mark's distinctiveness in the marketplace also must be considered in determining its strength," and "[r]egistration under the Lanham Act is also pertinent to a mark's strength." *Id.* at 118; *see also J.T. Colby*, 2013 WL 1903883, at *15 (The strength of the mark "inquiry encompasses two elements: (1) the degree to which the mark is inherently distinctive; and (2) the degree to which it has acquired distinctiveness in the marketplace").

The IONEX® mark is a registered, incontestable mark, and it is thus presumptively distinctive.  *See Classic Liquor Imps., Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 442 (S.D.N.Y. 2016) ("Registered marks, like those at issue here, are presumptively distinctive under the *Polaroid* analysis." (quotation omitted)).  "However, while the incontestable status of the registration creates a conclusive presumption as to the validity of the mark, such incontestability does not prevent the defendants from questioning the strength of the mark and the scope of its protection."  *Kozak Auto Drywash, Inc. v. Enviro-Tech Int'l, Inc.*, 823 F. Supp. 120, 123 (W.D.N.Y. 1993); *see also Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993)

(noting that "incontestability does not relieve the trademark owner from the requirement of proving likelihood of confusion," and affirming finding that incontestable mark was weak for purposes of likelihood of confusion analysis); *Montblanc-Simplo v. Aurora Due S.r.L.*, 363 F. Supp. 2d 467, 481 (E.D.N.Y. 2005) (finding that "an incontestably valid mark" was nonetheless a "relatively weak mark"). Accordingly, the Court has considered Defendant's contention that the IONEX® mark is weak and agrees, for the reasons discussed below.

Initially, the Court is not persuaded by Plaintiff's contention that its mark is strong because it is "an invented word" and therefore fanciful. (*See* Dkt. 96 at 13). Courts have rejected similar arguments. *See Classic Liquor*, 201 F. Supp. 3d at 443 ("[A] coined term is not a 'fanciful' one merely because it cannot be found in Webster's Third.") (collecting cases). Nor does the use of an abbreviation render a mark fanciful. *See, e.g., Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 574 (N.D. Ill. 1994) (holding that the mark "Spex, Inc." is descriptive because it "describes, or conveys the essence, of a store that sells glasses" (quotation omitted)). Just as the term "Spex" conveys the essence of a store that sells eyeglasses, the IONEX® mark conveys the essence of using ion exchange to chemically strengthen glass. The Court agrees with Defendant that a reasonable jury would find that the IONEX® mark was conceptually weak.

Defendant has also conclusively demonstrated that the IONEX® mark is commercially weak. "Even an inherently distinctive mark can, in its commercial context, lack strength as a mark." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114,

123 (2d Cir. 2001). In assessing the commercial strength of a mark, the Court considers

six factors:

> (1) the senior user's advertising and promotional expenses; (2) consumer studies linking the name to the source; (3) the senior user's sales success; (4) third-party uses and attempts to plagiarize the mark; (5) length and exclusivity of the mark's use; and (6) unsolicited media coverage of the products at issue.

*Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 489 (S.D.N.Y. 2004). In

this case, the evidence of record shows that these factors, considered as a whole, do not

demonstrate commercial strength. Plaintiff has spent relatively minor amounts of

advertising and promotion and there are no consumer studies linking the IONEX® name

to Plaintiff—to the contrary, Plaintiff's own expert, Mr. Berger, stated in his expert report

that "very few" of the glass buyers he interviewed had heard of IONEX®. (Dkt. 87-5 at

14). With respect to sales success, Plaintiff's sales, while certainly not insignificant, do

not rise to the level that courts have typically found to indicate commercial strength. There

has also been no unsolicited media coverage of Plaintiff's IONEX® branded services, nor

is there evidence in the record of significant third-party uses or attempts to plagiarize the

mark. The Court notes that there are factual disputes between the parties regarding the

exclusivity of the mark's use that are not amenable to resolution on a motion for summary

judgment. However, even finding that this one factor favors Plaintiff, no reasonable jury

could find on the facts before the Court that the IONEX® mark is commercially strong.

The Court notes that Plaintiff argues there is a potential in this case for both forward

and reverse confusion. "[D]istrict courts in this Circuit have held that, in a reverse

confusion case, the court should look to the *comparative* strength of the *junior user's* . . .

mark when assessing the first *Polaroid* factor." *THOIP II*, 788 F. Supp. 2d at 185. Here, there is no evidence in the record regarding the commercial strength of "Ion-X," and so no reasonable jury could find in Plaintiff's favor in this regard.

For all the foregoing reasons, the Court finds that the first *Polaroid* factor favors Defendant.

## 2.    Similarity of the Marks

The next *Polaroid* factor the Court considers is the similarity of the marks. "[I]n evaluating similarity, courts consider 'the mark's overall impression on a consumer, considering the context in which the marks are displayed and "the totality of factors that could cause confusion among prospective purchasers.""" *Codename Enters., Inc. v. Fremantlemedia N. Am., Inc.*, No. 16 Civ. 1267 (AT) (SN), 2018 WL 3407709, at *8 (S.D.N.Y. Jan. 12, 2018) (quoting *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005)). "The fact that two marks appear very similar or contain[ ] identical words is not dispositive." *Id.* (quotation omitted); *see also J.T. Colby*, 2013 WL 1903883, at *16 ("The fact that the marks use the same word is not dispositive if the differences in the ways the marks are presented in the marketplace make confusion less likely.").

Defendant has produced extensive evidence showing that, taking into account the contexts in which IONEX® and Ion-X appear, they are not similar to one another. In particular, Defendant has shown that wherever it uses the term "Ion-X," either the Apple word mark or the Apple logo appear in close proximity. *See J.T. Colby*, 2013 WL 1903883, at *17 (finding Apple iBooks mark not similar to the plaintiff's iBooks mark in part because

the Apple iBooks mark "appears in an Apple-branded environment"). The record before the Court further demonstrates that the IONEX® mark is used on packaging labels and invoices that are clearly labeled as originating with Plaintiff, and on Plaintiff's website where a consumer would again clearly be aware that it was Plaintiff offering IONEX®-branded services. Moreover, Dr. Farrell has opined, without any admissible rebuttal, that IONEX® and Ion-X are pronounced and spelled differently and will be perceived as different words by English readers. (Dkt. 85-1 at 21).

Plaintiff argues without elaboration, and citing no cases other than *Polaroid*, that this factor favors it because of the "similarity in spelling, pronunciation, and commercial appearance between the two word marks." (Dkt. 96 at 14). However, Plaintiff has pointed to no admissible evidence from which a reasonable jury could conclude that IONEX® and Ion-X, considered in the context in which they are actually displayed, are similar. Accordingly, the Court finds that this *Polaroid* factor favors Defendant.

### 3. Proximity of the Parties' Areas of Commerce

The third *Polaroid* factor is the proximity of the parties' areas of commerce. "The proximity inquiry asks to what extent the two products compete with each other. The purpose of the inquiry, which considers both market proximity and geographic proximity, is to determine whether the two products have an overlapping client base that creates a potential for confusion." *Classic Liquor*, 201 F. Supp. 3d at 447 (quotations and citation omitted).

The Court agrees with Defendant that the parties in this case offer completely different goods and services. It is undisputed that Plaintiff offers glass strengthening

services to other businesses, while Defendant sells electronic devices directly to consumers. Plaintiff's cursory argument that this factor favors it because "both IONEX and ION-X directly relate to chemically strengthened glass" (Dkt. 96 at 15) "does not withstand mild scrutiny," *Codename*, 2018 WL 3407709, at *9 (rejecting argument that the plaintiff's and defendant's services were similar because they "both create online content"). Plaintiff's argument "ratchets the level of abstraction so high," *id.*, as to render the concept of proximity meaningless. The undisputed record in this case shows that Plaintiff and Defendant are not competitors and do not have overlapping customer bases. This *Polaroid* factor strongly favors Defendant. *See Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 373 (S.D.N.Y. 2003) (finding this factor favored the defendant where the parties "compete[d] in different sectors of the candy industry").

### 4. Likelihood of Bridging the Gap

The next *Polaroid* factor "concerns the likelihood that [a] senior user that is not in direct competition with a junior user at the time a suit is brought will later expand the scope of its business so as to enter the junior user's market." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 531 (S.D.N.Y. 2011). "In order to bridge the gap, plaintiffs must demonstrate that they intend to enter the market of defendants and that prospective customers are aware of this intention." *Strange Music*, 326 F. Supp. 2d at 493; *see also Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 582 (2d Cir. 1991) ("[T]he intent of the prior user to expand or its activities in preparation to do so, unless known by prospective purchasers, does not affect the likelihood of confusion.") (quotation omitted). "The expansion must occur or be likely to occur in the 'reasonably near future.'" *YouGottaEat*,

*Inc. v. Checkers Drive-In Restaurants, Inc.*, 81 F. App'x 392, 395 (2d Cir. 2003) (quoting *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003)); *see also Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 295 (S.D.N.Y. 2012) ("A speculative intention is insufficient to demonstrate that bridging the gap is likely; a litigant should provide evidence of a concrete expansion plan.").

Here, Plaintiff cannot show that it is likely to bridge the gap and enter Defendant's market. Considering the evidence in the light most favorable to Plaintiff, it appears that on one occasion in 2015, Plaintiff chemically strengthened 40 units of glass for Samsung, and that no other consumers electronics company has ever otherwise purchased Plaintiff's services. (*See* Dkt. 96-8). While Plaintiff may wish to enter this market, there is simply no evidence that it has any concrete prospects of doing so in the reasonably near future, nor is there any evidence that prospective customers are aware of any plans by Plaintiff in this regard. Accordingly, this *Polaroid* factor strongly favors Defendant.

### 5. <u>Actual Confusion</u>

The fifth *Polaroid* factor is whether there is evidence of actual confusion. "Actual confusion is highly probative of the likelihood of confusion, and proof of actual confusion is generally shown through consumer surveys or anecdotal evidence of confusion, or empirical studies or expert testimony." *Classic Liquor*, 201 F. Supp. 3d at 448 (quotation omitted).

In this case, there is minimal evidence of actual confusion. As discussed above, the Berger Survey, on which Plaintiff relies, is so flawed as to be inadmissible under Rules 403 and 702. The Harper Survey, while not *per se* inadmissible, has significant

methodological flaws and is of limited evidentiary value. Moreover, the Harper Survey is directly contradicted by a survey performed by Defendant's expert, Dr. Deborah Jay.[12] (*See* Dkt. 83). Dr. Jay's survey appears to be methodologically sound and found no likelihood of confusion. (*Id.*).

Plaintiff also does not have probative anecdotal evidence of actual confusion. Plaintiff points to an e-mail from Dr. Varshneya's friend Dr. Charles Kurkjan in which Dr. Kurkjan asked if Plaintiff was supplying glass to Defendant. (*See* Dkt. 96-11). However, the actual confusion inquiry "focuses on the consuming public as a whole, not interested parties already familiar with the plaintiff's mark through personal connections." *Gameologist Grp*, 838 F. Supp. 2d at 162.

In sum, Plaintiff has produced only weak evidence of actual confusion, which is contradicted by Defendant's strong evidence to the contrary. The Court is cognizant that it must consider this evidence in the light most favorable to Plaintiff and, "[o]n balance, then, and in an abundance of caution," finds that "this factor is neutral and weighs in favor of neither party." *Codename*, 2018 WL 3407709, at \*11.

### 6. Bad Faith

The sixth *Polaroid* factor is whether the junior user acted in bad faith or was otherwise reprehensible in adopting the mark. The Court has already concluded, in connection with its consideration of Defendant's fair use defense, that no reasonable

---

[12] Dr. Jay is the principal and founder of Jay Survey Strategics LLC and previously served for 23 years as president and CEO of Field Research Corporation. (Dkt. 83 at ¶ 1). Dr. Jay has designed and directed over 800 surveys. (*Id.*). Plaintiff has not challenged the admissibility of Dr. Jay's survey and associated expert opinions.

factfinder could find that Defendant acted in bad faith in adopting the term "Ion-X." That conclusion is even stronger here, where it is Plaintiff that would bear the burden of demonstrating bad faith before a jury. Accordingly, this *Polaroid* factor favors Defendant.

### 7. Quality of the Junior User's Product

The next *Polaroid* factor is the quality of the junior user's product. "The analysis of the quality of a defendant'[s] product is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Codename*, 2018 WL 3407709, at *12 (quotation omitted). In support of its motion for summary judgment, Defendant presented substantial evidence that the Apple Watch device is known to be of high quality. (*See* Dkt. 78 at 29). Plaintiff's opposition papers fail to address this evidence at all or to discuss this *Polaroid* factor. The Court finds that this *Polaroid* factor strongly favors Defendant.

### 8. Sophistication of the Relevant Consumer Group

The final *Polaroid* factor is the sophistication of the relevant consumer group. Defendant has shown that the relevant consumer group is highly sophisticated. (*See* Dkt. 78 at 28). As with the quality of Defendant's product, Plaintiff's opposition papers do not address the sophistication of the parties' respective clienteles at all. Moreover, Plaintiff's counsel conceded at oral argument that Plaintiff was not contesting that this factor weighed against a likelihood of confusion. The Court finds that this final *Polaroid* factor also strongly favors Defendant.

Based on the foregoing analysis, "[w]eighing the *Polaroid* factors, the Court concludes that the ultimate question, whether a consumer is likely to be confused, must be

answered in the negative" by a reasonable trier of fact. *Codename*, 2018 WL 3407709, at *12. While Plaintiff's IONEX® mark is registered and incontestable and therefore entitled to protection, the IONEX® mark is weak both commercially and conceptually, Defendant and Plaintiff operate in completely different markets, and there is no reasonable prospect that Plaintiff will enter Defendant's market or otherwise bridge the gap. Defendant's goods are well-known for their high quality and the potential consumer market for both Defendant's product and Plaintiff's services is sophisticated and capable of discerning that the Apple Watch device is not associated with Plaintiff. Accordingly, the Court finds no genuine issues of material fact as to likelihood of confusion and concludes that Defendant is also entitled to summary judgment on this basis.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendant's motion in limine related to James T. Berger (Dkt. 87), denies Defendant's motion in limine related to Rhonda Harper (Dkt. 88), grants in part and denies in part Defendant's motion in limine related to Scott D. Woldow (Dkt. 89), denies as moot Plaintiff's motion in limine (Dkt. 76), and grants Defendant's motion for summary judgment (Dkt. 77). The Clerk of Court is directed to enter judgment in favor of Defendant and to close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: June 19, 2019
         Rochester, New York